ISABEL A. ELLIOTT, INDIVIDUALLY, AND ESTATE OF RANDALL T. ELLIOTT, DECEASED, ISABEL A. ELLIOTT, CO-EXECUTRIX, AND RANDALL T. ELLIOTT, JR., CO-EXECUTOR, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 67550.  Filed April 30, 1959.

*Willis T. Barber, Esq.*, for the petitioners.
*William O. Allen, Esq.*, for the respondent.

DRENNEN, *Judge:* Respondent determined a deficiency in the income tax of petitioners for the year 1954 in the amount of $19,947.93 and additions to tax under section 294(d), I.R.C. 1939,[1] in the amount of $3,395.87.

The only issue for determination is whether the distribution of all the stock of Centrifix Management Corporation, a wholly owned subsidiary, hereinafter referred to as Management, by Centrifix Corporation, hereinafter referred to as Centrifix, to Randall T. Elliott, the principal stockholder of Centrifix, on December 15, 1954, was taxable

---

[1] Effective with respect to taxable years beginning before January 1, 1955.  See sec. 6654(h), I.R.C. 1954.

as a long-term capital gain to Elliott or qualified as a nontaxable "split-off" under section 355, I.R.C. 1954.

Some of the facts were stipulated and are hereby found as stipulated.

Randall T. Elliott died on February 26, 1957. Isabel A. Elliott is the duly appointed and acting executrix of the Estate of Randall T. Elliott, deceased. Isabel Elliott resides in Chagrin Falls, Ohio, and is the surviving spouse of Randall T. Elliott. Randall T. Elliott and Isabel A. Elliott filed their joint income tax return for the calendar year 1954 with the district director of internal revenue at Cleveland, Ohio.

At all times material hereto, Centrifix was an Ohio corporation formed in 1926. As of December 15, 1954, it had authorized capital of 5,000 shares of preferred stock, having a par value of $100 per share, of which 1,852¾ shares were owned by Randall T. Elliott, 804¼ shares were held as treasury stock, and the balance was unissued. Centrifix was also authorized to issue 45,000 shares of common stock, having a par value of $1 per share, of which 24,275 shares were held by Randall T. Elliott, 530 were held by Isabel Elliott, 2,239 shares were held as treasury stock, 16,276 shares were unissued, and remaining balance of 1,680 shares were held by small scattered stockholders. Centrifix was organized to engineer and develop apparatus for the purification and separation of liquids and gases, and at all times material hereto was engaged in said business.

Management was incorporated under the laws of Ohio on April 22, 1950, as a wholly owned subsidiary corporation of Centrifix. At all times material hereto it had authorized capital of 150 shares of no-par common stock having a stated value of $100 per share.

In 1946, Centrifix acquired property at 3029 Prospect Avenue, Cleveland, Ohio, consisting of an old 2-story house with caretakers quarters and a carriage house in the rear. Centrifix occupied approximately one-half of the available space in the house and carriage house as an office and shop for its engineering business and made available for rent to various tenants the balance of the property. Centrifix continued to use part of this property in its business and rented the balance of the property until it was sold in 1950.

In 1950, Centrifix sold the property at 3029 Prospect Avenue and acquired property at 3608 Payne Avenue, Cleveland, Ohio. When the new property on Payne Avenue was acquired, it was transferred to Management in exchange for all of the stock of Management in a transaction that was tax free under section 112(b)(5), I.R.C. 1939.

During the period from April 27, 1950, to December 15, 1954, Management owned and operated the Payne Avenue property. The

property consisted of land and a 3-story brick loft building having a total area of 28,144 square feet, of which Centrifix leased 14,468 square feet, Tetrad Company, unrelated, leased approximately 5,200 square feet, and the balance was unoccupied but was available for rental to third parties.

On December 15, 1954, Randall T. Elliott surrendered to Centrifix the 1,852¾ shares of cumulative preferred stock of Centrifix which he owned, in exchange for which Centrifix transferred to Elliott 150 shares being all of the authorized common stock of Management, and canceled an indebtedness of $5,241.48 which had been owing from Elliott to Centrifix. No other consideration was involved in this transaction. However, Elliott agreed to surrender his 1,852¾ shares of preferred stock of Centrifix only if the entire balance of authorized preferred stock was canceled. At the same time Elliott agreed to the cancellation of cumulative past-due dividends on the preferred stock in the amount of $242,894.75.

On December 15, 1954, the 150 shares of no-par-value common stock of Management distributed in the above transaction to Elliott had a fair market value of $78,837.34, and the adjusted basis of 1,852¾ shares of Centrifix cumulative preferred stock in the hands of Elliott was $750. The book value of the Management stock received by Elliott was $38,259.74. As of December 15, 1954, and December 31, 1954, Centrifix had no accumulated earnings and profits.

In their 1954 return, petitioners reported no gain or loss on the above transaction.

During that part of the year 1946 after Centrifix acquired the Prospect Avenue property, and through that part of the year 1950, prior to the time said property was sold, Centrifix realized gross rental income from the Prospect Avenue property, gross income from all sources, net income from all sources, and reported net taxable income for each of the years 1946 through 1950 as follows:

| Period covered | Gross rental income | Gross income [1] | Net income [1] | Net taxable income |
|---|---|---|---|---|
| 1946 | $380.90 | $150,120.18 | $2,461.26 | ($707.39) |
| 1947 | 591.00 | 253,193.64 | 20,927.09 | 24,609.37 |
| 1948 | 780.00 | 238,280.53 | 13,516.60 | 17,424.16 |
| 1949 | 780.00 | 243,344.39 | 16,765.13 | 20,152.71 |
| 1950 [2] | 325.00 | 324,253.26 | 19,932.20 | 26,176.20 |

[1] All sources.        [2] 5 months.

The gross rental value of the entire Prospect Avenue property would have been between $1,700 and $1,800 per year during the period it was owned by Centrifix, if rented on a commercial basis. Centrifix made no allocation of expenses in connection with the Prospect Avenue property and it could not be determined from its books whether the rental portion of the property produced a net income or a net loss.

During the period April 22, 1950, to December 31, 1954, Management realized gross rental income and net income as follows:

| Period covered | Gross rental income | Net income |
|---|---|---|
| 1950 | $7,257.17 | $484.37 |
| 1951 | 14,682.44 | 1,884.79 |
| 1952 | 17,080.00 | 1,840.43 |
| 1953 | 19,292.00 | 3,034.64 |
| 1954 | [1] 19,179.00 | 3,757.60 |
|  |  | [2] 32.50 |

[1] Not including $217.47 from other sources.
[2] Discount earned.

As of January 1, 1954, petitioners were entitled to an unused capital loss carryover from prior years of $5,420.64.

During the period 1946 through 1950, Centrifix was not engaged in the active conduct of the real estate rental business within the meaning of section 355(b), I.R.C. 1954.

### OPINION.

The only issue is whether the distribution by Centrifix of all the stock of its wholly owned subsidiary, Management, to its principal stockholder, Elliott, qualifies as a nontaxable distribution under section 355, I.R.C. 1954.[2]

---

[2] SEC. 355. DISTRIBUTION OF STOCK AND SECURITIES OF A CONTROLLED CORPORATION.

(a) EFFECT ON DISTRIBUTEES.—

(1) GENERAL RULE.—If—

(A) a corporation (referred to in this section as the "distributing corporation")—

(i) distributes to a shareholder, with respect to its stock, or

\* \* \* \* \* \*

solely stock or securities of a corporation (referred to in this section as "controlled corporation") which it controls immediately before the distribution,

(B) the transaction was not used principally as a device for the distribution of the earnings and profits of the distributing corporation or the controlled corporation or both \* \* \*,

(C) the requirements of subsection (b) (relating to active businesses) are satisfied, and

(D) as part of the distribution, the distributing corporation distributes—

(i) all of the stock and securities in the controlled corporation held by it immediately before the distribution, or

\* \* \* \* \* \*

then no gain or loss shall be recognized to (and no amount shall be includible in the income of) such shareholder or security holder on the receipt of such stock or securities.

\* \* \* \* \* \* \*

(b) REQUIREMENTS AS TO ACTIVE BUSINESS.—

(1) IN GENERAL.—Subsection (a) shall apply only if either—

(A) the distributing corporation, and the controlled corporation \* \* \* is engaged immediately after the distribution in the active conduct of a trade or business, or

\* \* \* \* \* \*

(2) DEFINITION.—For the purposes of paragraph (1), a corporation shall be treated as engaged in the active conduct of a trade or business if and only if—

(A) it is engaged in the active conduct of a trade or business, \* \* \*

(B) such trade or business has been actively conducted throughout the 5-year period ending on the date of the distribution,

(C) such trade or business was not acquired within the period described in sub-

Section 355(a), I.R.C. 1954, insofar as here pertinent, provides that (1) if a corporation distributes to a shareholder with respect to his stock, solely stock of a corporation which it controls immediately before the distribution, (2) the transaction was not used principally as a device for distributing the earning or profits of either corporation, (3) the requirements of subsection (b) with reference to active conduct of businesses are satisfied, and (4) all of the stock of the controlled corporation held by the distributing corporation, or at least controlling stock of the subsidiary corporation, is distributed, then no gain or loss shall be recognized to the shareholder on receipt of the stock.

Petitioners concede on brief that the forgiveness of debt due to Centrifix from Elliott in the sum of $5,241.48, which was a part of the agreement under which Elliott received the stock of Management, constituted a taxable distribution. Respondent agreed in the opening statement of his counsel that the transaction was not used principally as a distribution of earnings and profits of either corporation. Both parties are in agreement that all requirements of section 355(a) are satisfied, except the requirement of subsection (b) relating to the active conduct of businesses.

Respondent does not question the fact that Management had been engaged in the real estate rental business from the date the Payne Avenue property was conveyed to it in April of 1950 to the date of distribution of its stock to Elliott on December 15, 1954, a period of less than 5 years, but does contend that such business had not been actively conducted by either Centrifix or Management prior to April of 1950, so that the 5-year active conduct of business requirement of subsection (b) was not satisfied. Respondent, therefore, determined that the distribution, to the extent that it exceeded basis, was taxable to Elliott as a capital gain, Centrifix having had no earnings or profits at the time of the distribution.

Petitioners contend that all the requirements of subsection (b), including the 5-year active conduct of the real estate rental business, were satisfied. So we are concerned only with whether the requirements of subsection (b) relating to active conduct of businesses are satisfied.

---

paragraph (B) in a transaction in which gain or loss was recognized in whole or in part, and

(D) control of a corporation which (at the time of acquisition of control) was conducting such trade or business—

(i) was not acquired directly (or through one or more corporations) by another corporation within the period described in subparagraph (B), or

(ii) was so acquired by another corporation within such period, but such control was so acquired only by reason of transactions in which gain or loss was not recognized in whole or in part, or only by reason of such transactions combined with acquisitions before the beginning of such period.

Subsection (b) of section 355 subjects the nonrecognition of gain or loss to a shareholder provided in subsection (a) to certain conditions. One of those conditions is that the distributing corporation and the controlled corporation are engaged immediately after the distribution in the active conduct of a trade or business. A corporation may be regarded as engaged in the active conduct of a trade or business only if, *inter alia*, "such trade or business has been actively conducted throughout the 5-year period ending on the date of the distribution." See sec. 355(b)(2)(B). Respondent concedes that Management was engaged in the real estate rental business immediately after the distribution, but argues that it was not actively engaged in that business for a total of 5 years prior to the distribution.

Management was not incorporated until April 22, 1950. The Payne Avenue property was acquired by Centrifix at sometime during 1950 and was transferred to Management in exchange for its stock. This stock was distributed to Elliott on December 15, 1954. Obviously, Management did not actively conduct and could not have actively conducted any business for 5 years prior to the distribution since it had been in existence for less than 5 years prior to December 15, 1954. Thus, the 5-year requirement of section 355(b)(2)(B) is not satisfied by the activities of Management alone, and cannot be satisfied under any circumstances in this case unless Centrifix actively conducted the same business for a period of at least 4½ months prior to the transfer of the Payne Avenue property to Management, and unless such a period of operation by Centrifix can be added to the period that Management conducted the business in order to satisfy the above requirement. We will assume for the purpose of further discussion that two such periods may be added together.

The issue then becomes whether Centrifix actively conducted a real estate rental business within the meaning of section 355(b) for a period of time prior to the formation of Management in 1950.

The evidence on this issue is that Centrifix was organized in 1926 to engineer and develop apparatus for the purification and separation of liquids and gases. Centrifix purchased an old house with a carriage house in the rear located on Prospect Avenue in Cleveland, Ohio, in 1946. Centrifix occupied about half the space in this property as its office and shop and rented the balance of the property to various tenants from the time it was acquired until it was sold in 1950. The gross rentals received did not exceed $780 per year in any of these years, which sum represented about 40 per cent of the rental value of the entire property, based on an 8 per cent gross return on the cost of the property. No allocation was made on the books of the company of that portion of the expenses attributable to the rented portion of the property, and there is no evidence with respect to the net income or loss attributable to that portion of the property.

There is no evidence as to the purpose for which Centrifix acquired this property, other than that it was used as its office and shop, or the reason it rented a part of the property, except the testimony of Isabel Elliott that "I suppose they weren't making a lot of money." The gross rental income represented a very small part of the total gross income of Centrifix. There is no evidence of any specific activity on the part of the management of Centrifix in renting this property and no evidence that Centrifix ever engaged in any other real estate rental activities.

When the Prospect Avenue property was sold in 1950 and the new Payne Avenue property acquired, the new property was put in the name of the newly formed subsidiary corporation, Management, which thereafter leased about one-half of the new property to Centrifix, and the balance to other tenants. Management did not engage in any other business activities and Centrifix continued in the engineering business.

On this evidence we are not convinced that prior to 1950 Centrifix could be considered to have been actively conducting the same business subsequently conducted by Management within the meaning of section 355(b). What constitutes a trade or business is not defined in section 355 or anywhere else in the Internal Revenue Code. This Court held in *John D. Fackler*, 45 B.T.A. 708 (1941), affd. 133 F. 2d 509 (C.A. 6), that where the owner of depreciable property devotes it to rental purposes and exclusively to the production of taxable income, the property is used by him in a trade or business and depreciation is allowable thereon. Since the *Fackler* case, we have also held that a single piece of rental property constitutes property used in a trade or business so as to be excluded from the definition of "capital assets" regardless of whether taxpayer was engaged in any other trade or business, *Leland Hazard*, 7 T.C. 372 (1946), and in *Anders I. Lagreide*, 23 T.C. 508 (1954), that real estate devoted to rental purposes constitutes use of the property in trade or business for purposes of determining operating loss carrybacks regardless of whether it is the only property so used, without too much inquiry into the activity of the taxpayer in renting and managing the property. But see *E. R. Fenimore Johnson*, 19 T.C. 93 (1952), wherein this Court held that the receipt of a small amount of rental income from certain minor portions of property formerly occupied as a residence was insufficient to convert the property to property used in a trade or business. However, the *Fackler*, *Hazard*, and *Lagreide* cases are not authority for holding that the incidental rental of that portion of real estate used in a trade or business which is not needed for the principal business constitutes the active conduct of a rental business within the meaning of section 355(b). In none of those cases was the property used for any other purpose than for rental to others. By this we do not mean to

imply that rental of a substantial part of property occupied in part by the owner for the conduct of its principal business cannot qualify as the active conduct of a trade or business within the meaning of section 355(b). But in section 355, we are concerned with the *active conduct of a trade or business*, and we must examine that phraseology in the light of the purpose for which it is used in this particular section of the Code. *Bazley* v. *Commissioner*, 331 U.S. 737, 740.

This provision was a part of section 353 of the Revenue Act of 1954 as originally introduced in the House of Representatives (H.R. 8300, 83d Cong., 2d Sess.). That section had no requirement relative to the active conduct of a trade or business either before or after the distribution. The Senate Finance Committee rewrote this provision as section 355 of its version of the bill, to introduce the requirement of active conduct of a trade or business both before and after the distribution, the stated purpose for the 5-year predistribution active conduct of a trade or business requirement being to provide a safeguard against avoidance not contained in the present law. See S. Rept. No. 1622, 83d Cong., 2d Sess., p. 50. The Senate thereby chose the 5-year active conduct of a trade or business limitation as one method of safeguarding against tax avoidance rather than a 10-year post-distribution penalty provision contained in the House version of the bill. The House accepted the Senate version but with the understanding that a trade or business which had been actively conducted throughout the 5-year period described would meet the requirements even though such trade or business underwent change during the 5-year period, such as an addition of new or the dropping of old products, changes in production capacity, and the like, provided the changes were not of such a character as to constitute the acquisition of a new or different business. See H. Rept. No. 2543, 83d Cong., 2d Sess., pp. 37–38.

This requirement in section 355(b) therefore necessitates an examination of the activities of the parent and subsidiary corporations in each of the two or more businesses conducted to determine whether this requirement is satisfied in each individual case. We do not think a mere passive receipt of income from the use of property which is used in the principal trade or business and which is only incidental to, or an incidental use of a part of property used primarily in, the principal business would constitute the active conduct of a trade or business within the meaning of section 355(b) of the Code, whether or not such use of property might constitute a trade or business within the meaning of other sections of the Code.

The Commissioner of Internal Revenue has defined a trade or business for purposes of section 355, in section 1.355–1(c), Income Tax Regs., as consisting of a "specific existing group of activities being carried on for the purpose of earning income or profit from only

such group of activities, and the activities included in such group must include every operation which forms a part of, or a step in, the process of earning income or profit from such group. Such group of activities ordinarily must include the collection of income and payment of expenses." The regulation goes on to state that it does not include certain specified activities, and then gives 16 examples of the application of the rules prescribed in the regulation. We do not find this regulation determinative of the issue here involved, either for or against petitioners. As a matter of fact, both respondent and petitioners, by way of contradistinction, rely on the regulations and rulings issued by respondent to support their respective positions in this case.

In this case the evidence does not support a conclusion that Centrifix was ever actively conducting a real estate rental business within the meaning of section 355, I.R.C. 1954. Its small amount of gross rental income, which of course helped to absorb some of the overhead of the property in which the principal business was conducted, was incidental to or a part of the principal business. No separate record of the expenses allocable to the rental property was kept and the company apparently could not have determined whether the rental activity produced a net gain or loss. There is nothing in the record from which we can conclude that Centrifix would have operated this property for rental purposes alone had it not also been used for the engineering business. When the old property was sold and the new property was acquired and placed in the name of a separate corporation, thus separating it accounting-wise and otherwise from the uncertainties and liabilities of the engineering business, there appeared an intent and design to go into the real estate rental business.

Why Centrifix did not hold the stock of Management for 4 or 5 additional months to complete the 5-year period prior to distributing Management's stock is not our concern. The fact is that Management had not been actively conducting its trade or business for a period of 5 years at the time of distribution, and we cannot find that Centrifix was actively conducting the same business within the meaning of section 355 prior to the formation of Management. The transaction therefore failed to qualify as a tax-free distribution under section 355, and the distribution was taxable as determined by respondent.

Petitioners' counsel mentioned in his opening statement that the 5-year requirement is satisfied if the business had been actively conducted for any part of 5 consecutive accounting years, so that Management's conduct of the business from April 27, 1950, to December 15, 1954, would meet this requirement in itself. While respondent discusses this argument at length in his original brief, petitioners did not argue the point in either their original or reply briefs, and we must assume they are not relying on this point. In any event, we think

it is clear from the wording of the statute itself and the committee reports, *supra*, that the 5-year period as used in this section means a period of 5 complete years ending on the date of the distribution.

Petitioners did not raise an issue with respect to the additions to tax if the transaction was held to be taxable.

*Decision will be entered for the respondent.*

