Estate of Thorval J. Lockwood, Deceased, National Bank of Commerce Trust and Savings Association, Successor to The First Trust Company of Lincoln, Nebraska, Executor, and Mrs. Margaret K. Lockwood v. Commissioner.
Estate of Lockwood v. Commissioner
Docket No. 2165-62.
United States Tax Court
T.C. Memo 1964-205; 1964 Tax Ct. Memo LEXIS 132; 23 T.C.M. (CCH) 1233; T.C.M. (RIA) 64205; August 3, 1964
Charles E. Wright, Lincoln Bldg., Lincoln, Neb., for the petitioners. Maxel B. Silverberg for the respondent. TRAIN
Memorandum Findings of Fact and Opinion TRAIN, Judge: A deficiency in 1956 income tax of $14,649.84 and an overassessment in 1957 income tax of $609.56 have been determined. Respondent having conceded a depreciation adjustment, the sole issue for decision is whether a distribution of the stock of a newly-organized subsidiary corporation to the stockholders of the parent corporation qualifies as a nontaxable transaction within the provisions of section 355 of the 1954 Code. Findings of Fact The stipulated facts are hereby found accordingly. Thorval J. Lockwood (hereinafter sometimes referred to as decedent) and his wife, Margaret K. Lockwood (hereinafter sometimes referred to as Margaret), resided in 1956 at 1700 Seventh Street, Gering, Nebraska. They filed a joint income tax return for the calendar year 1956, with the district director of internal revenue, Omaha, Nebraska. National Bank of Commerce Trust *134 & Savings Association, Lincoln, Nebraska (hereinafter referred to as National Bank) is a national banking association organized and existing under the laws of the United States and is the successor to The First Trust Company of Lincoln, Nebraska, a Nebraska corporation, formerly engaged in business in Nebraska as a trust company. Pursuant to the provisions of 12 U.S.C. Sec. 215, The First Trust Company of Lincoln, Nebraska, and National Bank of Commerce of Lincoln consolidated on September 11, 1961, under the latter's charter, and the name of National Bank was adopted. By the express provisions of the United States Code relating to the consolidation, National Bank succeeded to all of the fiduciary powers and rights of The First Trust Company of Lincoln, Nebraska. National Bank is now the duly appointed, qualified, and acting executor of the decedent, who died on August 7, 1957. Decedent and Margaret were stockholders in the Lockwood Grader Corporation (hereinafter referred to as Lockwood) at all times from prior to 1947 to decedent's death. Lockwood is a corporation organized in 1946 under and existing by virtue of the laws of Nebraska. Its predecessor, Lockwood *135 Graders, a partnership, was formed in 1935 for the purpose of producing and selling a portable potato sorting machine invented by decedent. Since its incorporation, Lockwood has been engaged in business in Nebraska and elsewhere in the United States, manufacturing and selling machines and equipment for use in the potato industry. In the early 1940's, Lockwood, and the predecessor partnership, primarily sold "wash lines," which were manufactured at Lockwood's plant in Gering, Nebraska. A "wash line" includes grading tables, washers, brushers, elevators, sackers, wax applicators, sewing machines, and baggers, used for washing, grading, waxing, and bagging potatoes. During those years decedent and Margaret would make selling trips. Starting in Alabama, they would go north through Missouri to North Dakota, and then back to Nebraska. They were primarily selling the "wash lines" to potato shippers. In or about 1954, Lockwood began manufacturing and selling field equipment, both the self-propelled and "pull type," to potato farmers. The types of equipment sold to farmers included harvesters, which dig potatoes from the ground and elevate them to trucks; bin loaders, which lift potatoes *136 in and out of potato cellars; and vine beaters, which go ahead of harvesters to knock the vines off the potatoes. The sale of parts for replacement and for use on other makes of equipment was always a large portion of Lockwood's business. Lockwood also sold sideline items necessary for potato growing, such as wax, bags, potato forks, and insecticides. During the years 1946 through 1951, Lockwood had its principal place of business at Gering, Nebraska, with branches located at Grand Forks, North Dakota; Antigo, Wisconsin; Monte Vista, Colorado; and Rupert, Idaho. During this period Lockwood also conducted its operations in other states. In 1951 Lockwood adopted a plan of reorganization in order to promote greater efficiency and to properly provide for expansion. The plan provided, inter alia, that: 1. The reorganization shall be in compliance with the "spin-off" method provided by Section 112(b)(11) of the Internal Revenue Code [of 1939] of the United States. 2. New corporations will be organized in the states of North Dakota, Wisconsin, Colorado, Idaho, and such other states as may be hereafter determined by the Board of Directors of Lockwood * * * for the best interests *137 of Lockwood * * * and its stockholders, as domestic corporations in the states in which their principal places of business are located * * *. 3. Upon completion of their organization in each state, each of these new corporations shall take over the business now conducted by the branch of the old corporation in its state and the old corporation shall cease to maintain a place of business or to conduct major business operations in that state. The new corporations shall take over the business of the old corporation in its area as of January 1, 1952. 4. There shall be transferred to each of said new corporations such assets pertaining to each branch as in the opinion of the president of Lockwood * * * are necessary or desirable for the new corporation in the operation of the business formerly conducted by the branch taken over by it, including stock, equipment, accounts payable and receivable, choses in action, and other assets, if any. * * *
6. In consideration for such transfers, each new corporation shall issue to Lockwood * * *, or to its stockholders in proportion to the stock held by each therein, stock fully paid up, in an amount equal to the value of the assets transferred *138 to it. 7. If issued to Lockwood * * * the stock of each new corporation shall be immediately transferred by Lockwood * * * to its stockholders in proportion to the stock held by each stockholder in Lockwood
* * *
9. It is intended that this plan of reorganization shall include new corporations to be organized in States other than those specifically named herein as the need for additional corporations appears necessary to provide for proper growth and decentralization of the business. The plan further recited that the following benefits were to be expected from the proposed reorganization: a. promoting efficient handling by local management acquainted with local conditions; b. relieving manufacturing facilities at Gering, Nebraska, by establishing shops in the various branches to do some of the manufacturing, taking advantage of local labor conditions and reducing transportation expense; c. building up local good will for Lockwood by the employment of more local labor; d. building up credit at local banks; e. permitting managers and other employees to buy and own stock in the corporations in which they are directly interested; f. minimizing prejudice against foreign *139 corporations in lawsuits in the event of litigation; g. eliminating the necessity for Lockwood to continue its qualification as a foreign corporation in North Dakota, Wisconsin, Colorado, and Idaho as soon as current transactions are closed; h. "The local businesses can better be diversified to take advantage of local conditions and total business done by all the corporations can considerably exceed what it would be practicable to do without decentralization. This is particularly true with the Colorado branch where it is anticipated over half of the business done will be the sale of Allis-Chalmers machinery and repairs, and other merchandise not procured from Lockwood * * *. Likewise in the Wisconsin branch, it is anticipated that a considerable portion of the sales will be steel buildings similar to Quonset buildings, and it is entirely probable that in time each new corporation will find that local conditions are such as to make it desirable to sell products other than Lockwood products"; and 1. placing the managers of the local business in position to bind only the local corporation; contracts made by the local managers resulting in loss will not affect the earnings of more *140 careful managers in other areas. New corporations were organized in the states of North Dakota, Wisconsin, Colorado and Idaho, to commence business on January 1, 1952. The stock of each corporation was distributed to the stockholders of Lockwood in accordance with the reorganization plan. After their organization, the four subsidiary corporations handled the sale and distribution of Lockwood equipment in their territories. Lockwood, the Nebraska corporation, continued to manufacture, sell and distribute equipment and machinery in Nebraska and elsewhere in the United States in territories not served by the subsidiary corporations. On April 11, 1947, Lockwood sold a 10-pound wheel to Orchard Park Gardens, Orchard Park, New York, for $89.50. On March 9, 1948, Lockwood sold a 10-pound wheel and attachments to Howard Farms, Sommers, Connecticut, for $107.25. On various occasions during the years 1949, 1950, 1951, 1952, 1953, 1954 and 1955, Lockwood sold products and parts to Gould & Smith, Inc. (hereinafter referred to as Gould & Smith), Presque Isle, Maine. Gould & Smith is, and has been since prior to 1947, a retailer of farming and industrial equipment in Maine. Gould & Smith's *141 major lines of equipment, during the years 1949 to the present, were manufactured by the Oliver Corp., Chicago, Illinois, and the Champion Corp., Hammond, Indiana. In 1949, Gould & Smith contacted Lockwood for the purpose of ordering two potato bin loaders and a few parts. Gould & Smith subsequently sold the potato bin loaders in the ordinary course of business. The potato bin loaders were the same type of equipment as that which Gould & Smith purchases from its other sources of supply and sells to its customers. The two potato bin loaders were the only pieces of equipment which Gould & Smith ever purchased from Lockwood and were the only pieces of Lockwood equipment which Gould & Smith ever sold or serviced. The major portion of the business conducted between the two companies was the purchase of parts from Lockwood by Gould & Smith. The parts which Lockwood manufactured could be, and in fact were, used on various makes of machinery other than those sold or handled by Lockwood. The parts which Gould & Smith purchased from Lockwood were resold at retail prices, either through their use in the repair of a customer's equipment or directly to the customer who would install the *142 part himself. These parts were similar to parts purchased by Gould & Smith from other sources of supply. Gould & Smith had no purchase agreement with Lockwood, and it had no agreement to serve Lockwood as a dealer, representative distributor or agent, or in any other capacity. Gould & Smith did not consider itself Lockwood's dealer, representative, distributor, or agent. Nor did Gould & Smith manufacture any equipment or parts for Lockwood at any time. The business relationship between Lockwood and Gould & Smith was that of manufacturer and retailer. It was the same type of relationship which Gould & Smith had with other manufacturers from which it purchased equipment and parts. Gould & Smith received the same purchase discount on the equipment and parts purchased from Lockwood as it received on the equipment and parts purchased from its other suppliers. Lockwood's yearly sales, before discount, to Gould & Smith for 1949 through 1951 were as follows: Year
Sales
1949
$1,755.40
1950
1,674.70
1951
132.70
The total yearly sales of Lockwood equipment and parts made by Gould & Smith prior to April 1, 1956, were less than one percent of the total sales made *143 by Gould & Smith each of those years. Gould & Smith has occasionally purchased parts for resale from Lockwood Graders of Maine, Inc. (hereinafter sometimes referred to as Maine Graders), since March 1, 1956. In November 1951, decedent, as president of Lockwood and in connection with Lockwood's business, traveled from Gering, Nebraska, to Presque Isle, Maine, where he remained November 18, 19, and 20. The purpose of the trip was to demonstrate a bag closer (also known as a bag stitcher or sewer) to Gould & Smith. Although such a bag closer was shipped to Gould & Smith, it was never purchased or sold by Gould & Smith. In August 1953, J. E. Parks, a salesman for Lockwood, traveled in Maine in connection with his sales of Lockwood products. At that time he obtained from farmers and businessmen other than Gould & Smith various orders, totaling about $3,000, for Lockwood machinery and equipment. On November 15, 1954, Lockwood established a branch in Presque Isle, Maine (hereinafter sometimes referred to as the Maine branch), which branch sold and promoted products manufactured by Lockwood and other companies. On November 24, 1954, Norman P. Ledew, Chief Examiner, Sales and Use *144 Tax Division, Bureau of Taxation of the State of Maine, wrote a letter to Lockwood in which he stated, inter alia: The Maine Sales and Use Tax Law requires every seller maintaining a place of business in Maine to register with the State Tax Assessor. * * * Included with the letter was an application for registration to be completed and returned to the Bureau of Taxation if Lockwood established a branch in Maine. In compliance with the Maine law, Lockwood filed an Application for Registration as a Seller upon establishing the Maine branch. The Bureau of Taxation issued Seller's Certificate No. 68173 to the Maine branch. In accordance with the law of Maine, the Maine branch filed monthly Sales and Use Tax Returns. The first return covered the period November 15, 1954, to November 30, 1954, which was the period when this branch began its operation. [1] The following statement appears on the return: If this return is for less than the entire month state who (succeeded) (preceded) you in business at the above address. None "New". *145 According to the monthly Sales & Use Tax Returns filed with the Bureau of Taxation for the period from November 15, 1954, through February 29, 1956, the Maine branch had the following yearly sales Year
Sales
1954
$ 9,045.00
1955
35,440.90
1956
9,237.92
In December 1954, J. L. Moravec, an employee of Lockwood, was moved to Presque Isle, Maine, as manager of the Maine branch. On March 1, 1956, pursuant to the 1951 reorganization plan, Maine Graders was incorporated under the laws of Maine, with its principal place of business at Presque Isle, Maine. Maine Graders was organized as a wholly-owned subsidiary of Lockwood. On the same date, in accord with action taken by its Board of Directors at a regular meeting on February 7, 1956, Lockwood transferred to Maine Graders, upon the latter's organization, assets with a value of $23,500. In exchange for the assets, Maine Graders issued 235 shares of $100 par value common stock to Lockwood. The assets, transferred to Maine Graders by Lockwood at their fair market values, were as follows: Fair Market
Asset
Value
Petty cash
$ 150.00
Accounts receivable
4,686.67
Automobiles and trucks
1,100.00
Shop equipment
295.00
Office furniture and fixtures
81.60
Inventory
17,186.73
Total
$23,500.00
*146 On or about March 31, 1956, after receipt of the Maine Graders stock, and pursuant to the 1951 reorganization plan, Lockwood distributed 162 of its 235 shares of Maine Graders stock to decedent and the remaining 73 shares to Margaret. These 235 shares were all of the issued and outstanding stock of Maine Graders at the time. The shares were distributed to decedent and Margaret in proportion to their holdings in Lockwood. No distribution other than the stock in Maine Graders was made to the Lockwood stockholders at the time. Immediately before and at the time of this distribution, Lockwood controlled Maine Graders. Neither decedent nor Margaret gave any consideration for the Maine Graders stock which was distributed to them by Lockwood on March 31, 1956. On March 31, 1956, immediately prior to the distribution of the Maine Graders stock by Lockwood, the Lockwood surplus account had a $261,891.20 balance from earned surplus and undivided profits. On March 31, 1956, after the distribution of the Maine Graders stock, Lockwood was actively engaged in the business of manufacturing, selling, and distributing its products; and Maine Graders was engaged in the business of selling, *147 distributing, and servicing products manufactured by Lockwood and selling products manufactured by others. After March 31, 1956, Maine Graders was also engaged in manufacturing. The Maine branch had not had the facilities to manufacture before that date. None of the trade or business of Maine Graders or its stock distributed to Lockwood's stockholders was acquired in any transaction in which gain or loss was recognized, in whole or in part. The monthly Sales and Use Tax Returns filed by Maine Graders with the Maine Bureau of Taxation for the period beginning March 1, 1956, through December 31, 1957, show the following yearly sales: Year
Sales
1956
$119,311.98
1957
139,254.88
In his deficiency notice, dated March 22, 1962, respondent gave the following "explanation of adjustment": It is determined that the transfer by Lockwood * * * of a portion ($23,500.00) of its assets to [Maine Graders] in exchange for all of the [Maine Graders] stock, and the subsequent distribution by Lockwood * * * of such [Maine Graders] stock to [decedent and Margaret], as shareholders of Lockwood * * *, is not a tax-free exchange under the provisions of section 355 or any *148 other section of the Internal Revenue Code of 1954. Accordingly, the distribution of stock to [decedent and Margaret] in the amount of $23,500.00 is taxable as dividend income in the taxable year ended December 31, 1956, under sections 301 and 316 of the 1954 Code. * * * Lockwood did not actively conduct a business in the Maine area for five years prior to March 31, 1956. Opinion Respondent contends that the distribution by Lockwood to decedent and Margaret of all its shares of Maine Graders stock constituted a dividend [2] to them, taxable under sections 301 and 316 of the 1954 Code, rather than a nontaxable transaction within the provisions of section 355. *149 Section 355(a), insofar as applicable here, provides that (1) if a corporation distributes to its stockholders with respect to their stock, solely stock of a corporation which it controlled immediately before the distribution, (2) the transaction was not used principally as a device for distributing the earnings or profits of either corporation, (3) the requirements of subsection (b) with reference to active conduct of businesses are satisfied, and (4) all of the stock of the controlled corporation held by the distributing corporation is distributed, then no gain or loss shall be recognized to the shareholders on receipt of the stock. Theodore F. Appleby, 35 T.C. 755, 760 (1961), affirmed per curiam 296 F. 2d 925 (C.A. 3, 1962), certiorari denied 370 U.S. 910 (1962). The parties are agreed that Maine Graders was incorporated for valid business purposes. See Gregory v. Helvering, 293 U.S. 465 (1935). The parties are further in accord that the first, second, and fourth conditions of section 355(a) have been complied with. Therefore, *150 our inquiry is narrowed to whether the third condition, encompassing the provisions [3] of section 355 (b), has been met. *151 We have found, pursuant to the parties' stipulation, that both Lockwood, the distributing corporation, and Maine Graders, the controlled corporation, were engaged immediately after the distribution in the active conduct of a business. See Albert W. Badanes, 39 T.C. 410 (1962). The requirements imposed by subsections 355(b)(2)(C) and (D) are likewise fulfilled. Accordingly, the crux of our inquiry is whether the trade or business of Maine Graders was actively conducted throughout the five-year period ending March 31, 1956, the date Lockwood distributed the Maine Graders stock to its shareholders. At the outset, we note that whether the business in Maine was separate from that of Lockwood or an integral part thereof is of no consequence, see Rev. Rul. 64-147, I.R.B. 1964-20, 12, revoking Rev. Rul. 61-198, 1961-2 C.B. 61, so long as that business was actively conducted throughout the five-year period prior to the distribution of the Maine Graders stock by Lockwood. Commissioner v. Coady, 289 F. 2d 490 (C.A. 6, 1961), affirming 33 T.C. 771 (1960); United States v. Marett, 325 F. 2d 28 (C.A. 5, 1963); *152 W. E. Gabriel Fabrication Co., 42 T.C. - (June 16, 1964). It has been said that "[what] constitutes a trade or business is not defined in section 355 or anywhere else in the Internal Revenue Code." Isabel A. Elliott, 32 T.C. 283, 289 (1959). Likewise, what is meant by the "active conduct of a trade or business" is nowhere explained in the Code. Whether there has been the "active conduct of a trade or business" for the requisite five-year period is, perforce, a factual question. Cf. Commissioner v. Heininger, 320 U.S. 467 (1943). Viewing the petitioners' evidence in the most favorable light, we are nonetheless compelled to conclude that the business of Maine Graders was not "actively conducted" throughout the five-year period prior to March 31, 1956. Section 1.355-1(c), Income Tax Regs., [4] clearly indicates that the term "trade or business" as used in section 355, encompasses the active carrying on of a business in contra-distinction to *153 the passive receipt of income. [5] With a view toward this dichotomy, the respondent's determination was upheld in Isabel A. Elliott, supra, and in the two cases citing and following it, Theodore F. Appleby, supra, and Bonsall v. Commissioner, 317 F. 2d 61 (C.A. 2, 1963), affirming a Memorandum Opinion of this Court, all of which are relied on by respondent. In all three cases, the "business" which was incorporated was real estate ownership and rental. Prior to incorporation, the rental of the real estate had been incidental to the principal business. See H. Grady Lester, Jr., 40 T.C. 947, 958 (1963). Consequently, we stated, in Elliott, at 290, that: We do not think a mere passive receipt of income from the use of property which is used in the principal trade or business and which is only incidental to, or an incidental use of a part of property used primarily in, the principal business would constitute the active conduct of a trade or business within the meaning of section 355(b) of the Code, whether or not such use of property might constitute a trade or business within the meaning of other sections of the Code. See also *154 Rev. Rul. 56-266, 1956-1 C.B. 184. Cf. Rev. Rul. 56-557, 1956-2 C.B. 199. *155 Respondent's reliance on Elliott, Appleby, and Bonsall is misplaced, for those cases are clearly distinguishable from the present factual situation. Here there was not just the receipt of rental or investment income. There was no rental to the principal business, nor was there any inter or intracompany sales pattern. The activities in Maine were completely independent of the principal business in their production of income. There was thus not a "mere passive receipt of income," but an active business, conducted with the intent that the Maine activities should produce income independently of intra-company devices. The question remains whether the business was actively conducted throughout the five-year period ending on March 31, 1956. And it is, of course, the petitioners' burden to prove that such was the case. Unfortunately, since we do not view the distribution as running afoul of the congressional purpose [6] behind section 355, see W. E. Gabriel Fabricating Co., supra, the petitioners have not met their burden. *156 We have no difficulty in construing the Maine business as having been actively conducted from the date of the establishment of the Maine branch on November 15, 1954. And we would have little hesitation in finding that the Maine business was actively conducted from August 1953, at which time a Lockwood salesman personally solicited orders from farmers and businessmen other than Gould & Smith throughout Maine. Our difficulty lies in the absence of evidence that the Maine business was actively conducted during the months between March 31, 1951, and August 1953 - a span of time totaling over 40 percent of the requisite five-year period. See section 1.355-1(d), example (9), Income Tax Regs. See also Isabel A. Elliott, supra. The parties have stipulated, and we have found, that Lockwood sold to Gould & Smith on various occasions during 1951 and 1952. Yet, as we have also found, the total sales to Gould & Smith in all of 1951 were only $132.70, at best a de minimis sum. Moreover, there was presented no evidence as to the volume or dollar amount of Lockwood's 1952 sales to Gould & Smith. The records of Lockwood admitted into evidence to show its sales to Gould & Smith *157 during the years 1949 through 1953 do not list any 1952 sales. Furthermore, Lockwood's sales to Gould & Smith, which, except for two potato bin loaders in 1949, embraced only replacement parts and minor products, could have been, and apparently were, conducted through the mail, without any active solicitation by Lockwood. The initial contact between the two companies had been made by Gould & Smith, not by Lockwood. And the lone time a Lockwood representative, decedent, went to Maine prior to 1953, it was to demonstrate a piece of equipment to Gould & Smith which Gould & Smith never purchased from or sold for Lockwood. That Gould & Smith did not consider itself Lockwood's agent or distributor, that the sale of Lockwood's products constituted less than one percent of Gould & Smith's total yearly sales, and that the dollar amount of Lockwood sales in the Maine area during 1951, and undoubtedly 1952, was so inconsequential, all militate against finding for the petitioners and support our conclusion that the five-year active conduct test [7] has not been met. Thus, the distribution does not qualify as a nontaxable distribution within the provisions of section 355. *158 As there were adequate earnings and profits in the Lockwood surplus account immediately prior to Lockwood's distribution of the Maine Graders stock, and as petitioners have not otherwise explained the distribution, we hold that the distribution constituted a taxable dividend to the petitioners under sections 301 and 316. Respondent having conceded the only other issue, Decision will be entered under Rule 50. Footnotes
1. The Application for Registration as a Seller filed with the Bureau of Taxation erroneously gives November 15, 1955, as the date the Maine branch started business. Other evidence shows, and respondent concedes, that the branch started business on November 15, 1954.↩
2. SEC. 301 [I.R.C. 1954]. DISTRIBUTIONS OF PROPERTY. (a) In General. - Except as otherwise provided in this chapter, a distribution of property (as defined in section 317(a)) made by a corporation to a shareholder with respect to its stock shall be treated in the manner provided in subsection (c). * * *
(c) Amount Taxable. - In the case of a distribution to which subsection (a) applies - (1) Amount Constituting Dividend. - That portion of the distribution which is a dividend (as defined in section 316) shall be included in gross income. * * *
SEC. 316 [I.R.C. 1954]. DIVIDEND DEFINED. (a) General Rule. - For purposes of this subtitle, the term "dividend" means any distribution of property made by a corporation to its shareholders - (1) out of its earnings and profits accumulated after February 28, 1913, or (2) out of its earnings and profits of the taxable year (computed as of the close of the taxable year without diminution by reason of any distributions made during the taxable year), without regard to the amount of the earnings and profits at the time the distribution was made.↩
3. SEC. 355 [I.R.C. 1954]. DISTRIBUTION OF STOCK AND SECURITIES OF A CONTROLLED CORPORATION. * * *
(b) Requirements As To Active Business. - (1) In General. - Subsection (a) shall apply only if either - (A) the distributing corporation, and the controlled corporation (or, if stock of more than one controlled corporation is distributed, each of such corporations), is engaged immediately after the distribution in the active conduct of a trade or business, or (B) immediately before the distribution, the distributing corporation had no assets other than stock or securities in the controlled corporations and each of the controlled corporations is engaged immediately after the distribution in the active conduct of a trade or business. (2) Definition. - For purposes of paragraph (1), a corporation shall be treated as engaged in the active conduct of a trade or business if and only if - (A) it is engaged in the active conduct of a trade or business, or substantially all of its assets consist of stock and securities of a corporation controlled by it (immediately after the distribution) which is so engaged, (B) such trade or business has been actively conducted throughout the 5-year period ending on the date of the distribution, (C) such trade or business was not acquired within the period described in subparagraph (B) in a transaction in which gain or loss was recognized in whole or in part, and (D) control of a corporation which (at the time of acquisition of control) was conducting such trade or business - (i) was not acquired directly (or through one or more corporations) by another corporation within the period described in subparagraph (B), or (ii) was so acquired by another corporation within such period, but such control was so acquired only by reason of transactions in which gain or loss was not recognized in whole or in part, or only by reason of such transactions combined with acquisitions before the beginning of such period.↩
4. § 1.355-1 Distribution of stock and securities of controlled corporation. * * *
(c) Active business. Section 355 is not applicable unless the controlled corporation and the distributing corporation are each engaged in the active conduct of a trade or business. For specific rules in this connection see section 355(b)(1) and (2). Without regard to such rules, for purposes of section 355, a trade or business consists of a specific existing group of activities being carried on for the purpose of earning income or profit from only such group of activities, and the activities included in such group must include every operation which forms a part of, or a step in, the process of earning income or profit from such group. Such group of activities ordinarily must include the collection of income and the payment of expenses. It does not include - (1) The holding for investment purposes of stock, securities, land or other property, including casual sales thereof (whether or not the proceeds of such sales are reinvested), (2) The ownership and operation of land or buildings all or substantially all of which are used and occupied by the owner in the operation of a trade or business, or (3) A group of activities which, while a part of a business operated for profit, are not themselves independently producing income even though such activities would produce income with the addition of other activities or with large increases in activities previously incidental or insubstantial. ↩
5. There is some doubt as to whether the regulations pertaining to section 355 are entirely viable today. See Rev. Rul. 64-147, I.R.B. 1964-20, 12, revoking Rev. Rul. 61-198, 1961-2 C.B. 61↩.
6. The purpose was to provide "a safeguard against avoidance." S. Rept. No. 1622, 83d Cong., 2d Sess., p. 51 (1954). See Isabel A. Elliott, supra, at 290↩.
7. The five-year active conduct rule has been described as the "most severe" requirement of section 355. Young, Corporate Separations: Some Revenue Rulings under Section 355, 71 Harv. L. Rev. 843 (1953). See also Lyons, Some Problems in Corporate Separations Under the 1954 Code, 12 Tax L. Rev. 15↩ (1956); 3 Mertens, Law of Federal Income Taxation, sec. 20.103, note 21 (1957 revision).